**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SANDERLING MANAGEMENT LTD., | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:20-cv-04627 |
| | ) | |
| v. | ) | Honorable Judge John Robert Blakey |
| | ) | |
| SNAP INC., | ) | |
| | ) | |
| Defendant. | ) | |

**SNAP'S MEMORANDUM OF LAW IN SUPPORT**
**OF ITS MOTION FOR ENTRY OF SOURCE CODE**
**INSPECTION PROTOCOL AND PATENT PROSECUTION BAR**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...........................................................................................1

II.     CERTIFICATION OF MEET AND CONFER ...........................................3

III.    FACTUAL BACKGROUND. ......................................................................3

      A.      Snap's Source Code is Among the Company's Most Important Assets................3

      B.      Snap Goes To Extraordinary Lengths to Protect Its Source Code.........................5

IV.     GOOD CAUSE EXISTS FOR A SOURCE CODE INSPECTION PROTOCOL..............6

      A.      The Federal Circuit, this Court, And Many Others Have Recognized The Necessity Of Source Code Inspection Protocols. ....................................................6

      B.      The Model Order Does Not Obligate Recipients Of Snap's Code To Protect It From Inadvertent Disclosure.................................................10

      C.      Sanderling's Counsel Sought Identical Protections For Their Other Clients. ..........................................................11

      D.      Sanderling Previously Agreed to Most of The Protections Snap Seeks. ..............12

V.      GOOD CAUSE EXISTS FOR AN ORDER REQUIRING A PROSECUTION BAR. .............................................14

VI.     CONCLUSION...............................................................................................15

## TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*AlexSam, Inc. v. Simon Property Group, LP*
    Case No. 2-19-cv-00331, Doc. 37 (E.D. Tex. June 8, 2020)....................................11

*Berkheimer v. Hewlett Packard Co.*
    Case No. 1:12-cv-09023, Doc. 56 (N.D. Ill. April 7, 2014) .............................1, 7, 8

*Blackbird Tech LLC d/b/a Blackbird Technologies v. Advanced Discovery Inc.*
    Case No. 1:16-cv-00413, Doc. 28 (D. Del. Jan. 19, 2017).....................................11

*In re Deutsche Bank Trust Co. Americas*
    605 F.3d 1373 (Fed. Cir. 2010)......................................................................14, 15

*Drone Technologies, Inc. v. Parrot S.A.*
    838 F.3d 1283 (Fed. Cir. 2016)...............................................................................7

*EPL Holdings, LLC v. Apple Inc.*
    Case No. C-12-04306 JST, 2013 WL 2181584 (N.D. Cal. May 20, 2013)........................9, 15

*FatPipe, Inc. v. Talari Networks, Inc.*
    Case No. 1-16-cv-00054, Doc. 43 (E.D.N.C. Nov. 4, 2015) ..................................11

*FatPipe, Inc. v. Viptela, Inc.*
    Case No. 1-16-cv-00182, Doc. 46 (D. Del. Sept. 7, 2016) .....................................11

*GeoTag v. Classified Ventures, LLC*
    Case No. 1:13-cv-00295, Doc. 102 (E.D. Tex. January 8, 2013) .............................9

*Helios Streaming, LLC v. Starz Entertainment, LLC*
    Case No. 8-19-cv-02140, Doc. 45 (N.D. Cal. May 26, 2020) ..........................11, 12

*Jager Pro Incorporated v. W-W Manufacturing Co., Inc.*
    Case No. 5-20-cv-00095, Doc. 29 (W.D. Ok. May 26, 2020).................................11

*Juniper Networks, Inc. v. Bahattab*
    Case No. 07-1771, 2008 WL 11403235 (PLF)(AK), (D.D.C., Nov. 12, 2008) .......................9

*Lighthouse Consulting Group, LLC v. Bank of America*
    NA, Case No. 2-19-cv-00250, Doc. 53 (E.D. Tex. Dec. 11, 2019) ........................11

*Philips Medical Systems, Inc., v. Zetta Medical Technologies, LLC*
    Case No. 1:17-cv-03425, Doc. 43 (N.D. Ill. Nov. 14, 2017)....................................9

*Realtime Data LLC d/b/a IXO v. Acronis, Inc.*
    Case No. 1-17-cv-11279, Doc. 30 (D. Mass. Sept. 13, 2017) ................................11

*Rockstar Consortium US LP v. Google Inc.*
Case No. 2:13-cv-893, 2014 WL 5831041 (E.D. Tex., June 19, 2014)...................................13

*Sound View Innovations, LLC v. Facebook, Inc.*
Case No. 1:16-cv-00116-RGA, Doc. 35 (D. Del., July 8, 2016)..............................................13

*Telebuyer, LLC v. Amazon.com, Inc.*
Case No. 13-cv-1677, 2014 WL 5804334 (W.D. Wash. Jul. 7, 2014)............................11, 15

*UnoWeb Virtual, LLC v. Open Text, Inc.*
Case No. 2-19-cv-00008, Doc. 32 (E.D. Tex. June 10, 2019)..................................................11

*Via Vadis Controlling GmbH v. Skype, Inc.*
No. Civ.A. 12–MC–193-RGA, 2013 WL 646236 (D. Del. Feb. 21, 2013) .............................8

*Voice Domain Technologies, LLC v. Apple, Inc.*
Case No. 13-40138-TSH, 2014 WL 5106413 (D. Mass. Oct. 8, 2014)...................................15

Other Authorities

Federal Rule of Civil Procedure 26(c) ...................................................................................1,

Local Patent Rule 1.4 ...................................................................................................1, 3, 6, 9

Local Rule 37.2 ......................................................................................................................3

Law Firm Representing Lady Gaga, Madonna, Bruce Springsteen, and Others
Suffers Major Data Breach, *available at*
https://variety.com/2020/digital/news/entertainment-law-firm-hacked-data-
breach-lady-gaga-madonna-bruce-springsteen-1234602737/; ................................................11

Epiq's Ransomeware Response Is By The Books But Dangers Still Lurk,
*available at* https://www.abajournal.com/news/article/legal-services-
company-shuts-down-systems-after-ransomware-attack.........................................................11

For hackers, law firms are "one-stop shopping," *available at*
https://www.dentons.com/en/insights/articles/2016/september/6/for-hackers-
law-firms-are-one-stop-shopping .....................................................................................10, 11

https://www.dentonslee.com/en/nicholas-park; https://www.dentons.com/en/jeff-
modisett ...............................................................................................................................15

Model Protective Order for Litigation Involving [Patents] Patents, Highly
Sensitive Confidential Information and/or Trade Secrets, ¶ 9 (N.D. Cal.)
*available at* https://www.cand.uscourts.gov/wp-content/uploads/forms/model-
protective-
orders/ND_Cal_Patent_Highly_Sensitive_Model_Prot_Ord_Revised.docx ...........................7

Appendix LPR 2.2, ¶¶ 12-19 (W.D. Penn.), *available at*
https://www.pawd.uscourts.gov/sites/pawd/files/Local%20Patent%20R%20-
%2012-5-2015.pdf ............................................................................................7

Source Code Provision To Be Inserted In Model Commission APO (Int'l Trade
Comm.), *available at*
https://www.usitc.gov/press_room/documents/featured_news/Ediscovery_atta
chment1.pdf#:~:text=Source%20Code%20Provision%20to%20be%20inserted
%20in%20Model,object%20code%20%20%28i.e.%2C%20computer%20instructi
ons%20and%20data%20........................................................................................7

Judge Andrew Guilford (ret. 2019) Standing Protective Order, ¶5 (C.D. Cal.),
*available at*
https://www.cacd.uscourts.gov/sites/default/files/documents/AG/AD/AJG%20
Standing%20Protective%20Order.pdf.................................................................7

Chief Judge Leonard Stark Default Standard for Access to Source Code (D. Del.),
*available at* https://www.ded.uscourts.gov/sites/ded/files/DefStdAccess.pdf .........................7

Chief Judge Rodney Gilstrap Sample Protective Order For Patent Cases, ¶ 10
(E.D. Tex.), *available at*
https://www.txed.uscourts.gov/sites/default/files/judgeFiles/Sample_Protectiv
e_Order_Patent_Cases_%28April%202019%29.docx...........................................7

## I.       INTRODUCTION

Pursuant to the Court's December 8, 2020 Order (Doc. 37), Defendant Snap Inc. ("Snap") recognizes that the Appendix B Model Protective Order ("Model Order") governs the production and use of Confidential and Highly Confidential information in this case. There is one category of information – Snap's source code[1] – for which Snap respectfully submits the Model Order does not provide sufficient protection. Snap's code is one of Snap's most significant and sensitive assets. Any improper disclosure of Snap's code would pose unacceptable risks not only to Snap but also Snapchat application users. This Court has previously modified the Model Order include a code inspection protocol. *Berkheimer v. Hewlett Packard Co.,* Case No. 1:12-cv-09023, Doc. 56, (N.D. Ill. April 7, 2014) (modifying Model Order to include protocol because "[t]he production and review of source code involves certain security risks because of its highly confidential and proprietary nature"). Accordingly, pursuant to Local Patent Rule 1.4 and Federal Rule of Civil Procedure 26(c), Snap submits this memorandum of law in support of its Motion for Entry of the attached Source Code Inspection Protocol and Patent Prosecution Bar (Ex. A).

Good cause exists for ordering the production of Snap's source code subject to an inspection protocol that includes heightened security measures. *First,* Snap's source code is among the company's most valued and sensitive assets. *Second*, Snap takes extraordinary measures to prevent inadvertent or intentional exfiltration of its source code. These measures are necessary to ensure that Snap retains its competitive advantage among social media applications and also to protect Snap's users and user data. *Third*, source code inspection protocols are typical in patent infringement cases involving technology products. Counsel for Sanderling is very familiar with

---

[1] Snap's source code is the only information that is "sufficient to show the operation and construction of all aspects or elements of" the Snapchat application. Monastyrshyn Decl., ¶ 5. Snap produced for inspection two representative versions of its code. *See* Doc. 44, pp. 4-5.

these types of protocols, as they have negotiated numerous orders containing the very provisions that Snap now proposes. Numerous courts, including the Federal Circuit, have recognized the necessity for additional security to protect source code because it is a company's most valued asset.

*Fourth*, before the Court issued its December 8 Order, Sanderling *agreed* to the vast majority of the inspection protocol Snap proposes. It was only after the Court denied Snap's Motion for Protective Order that Sanderling rescinded its agreement to have any inspection protocol whatsoever. Sanderling's initial agreement indicates that it would not be prejudiced in any way if the Court entered the protocol. *Fifth*, the inspection protocol is narrowly tailored to accomplish its purpose – the protection of Snap's source code. The proposed protocol generally includes: (1) a requirement that the inspection take place on a non-networked computer at any domestic office of Snap's outside counsel; (2) a limitation on the total number of pages of source code that may be printed; (3) a restriction against transmitting the source code electronically;[2] and (4) a restriction against transmitting the source code outside of the United States.

Additionally, although the parties' previously agreed-to protocol was entirely appropriate, Snap has modified the protocol it proposes here to address certain complaints Sanderling raised after the Court issued its December 8 Order. These modifications permit Sanderling's expert to print copies of source code during his review (as opposed to saving copies on the inspection machine). They also require Snap to provide a source code review tool that will permit Sanderling to search the code for key words (as opposed to requiring Sanderling to provide the tool).[3] These modifications also match the provisions of other orders that Sanderling's counsel agreed to.

---

[2] The protocol permits Sanderling to transmit short snippets of code if it encrypts the transmission.

[3] Sanderling previously agreed to print the source code to .pdf and save it to the inspection machine. Ayers Decl., Ex. C, p. 12. Sanderling also previously agreed that it would provide any source code review tools it wanted to use. *Id.*, Ex. E., pp. 12-13. Sanderling complained about these requirements *after* its initial inspection of Snap's source code. In the spirit of compromise, Snap proposed the modifications listed above, but Sanderling still opposes Snap's Source Code Inspection Protocol.

Sanderling's counsel is therefore familiar with such a protocol and how it is implemented.

Finally, the Model Order contains a patent prosecution bar for drugs and biologics, which are not relevant in this case, but it does not contain a prosecution bar for patents covering computer programs or computer applications. The Founder and Director of Sanderling is the inventor of the Asserted Patents. The Dentons law firm includes attorneys that advise Snap competitors (like Facebook) on "patent protection and monetization strategies" and "product and feature development." Snap's proposed prosecution bar is narrowly tailored and necessary to prevent individuals who review Snap's source code and highly confidential technical information from causing Snap competitive harm by filing or amending patent claims designed to read on Snap's products. Accordingly, entry of the proposed prosecution bar is appropriate.

## II.    CERTIFICATION OF MEET AND CONFER

Pursuant to Local Rule 37.2, counsel for Snap engaged in good faith efforts to resolve this dispute. Specifically, the parties exchanged emails from December 14-31 regarding a modified protective order and/or inspection protocol.[4] Counsel for Snap asked counsel for Sanderling  to participate in a telephonic meet and confer. Ayers Decl. Ex. R. Despite two e-mails and a voicemail, counsel for Sanderling has not responded. Based upon Sanderling's last communications (*id.* Ex. O-P), Snap believes the parties are at an impasse.

## III.    FACTUAL BACKGROUND.

### A.    *Snap's Source Code is Among the Company's Most Important Assets.*

Snap considers the source code for its Snapchat application to be among its most valuable

---

[4] Ayers Decl. Ex. B-P and R attaches most of the parties' e-mails regarding their negotiation of the draft protective order and the inspection protocol. Snap ordinarily would not burden the Court with communications between counsel. Although Local Patent Rule 1.4 permits a party to move to modify the Model Order for good cause, Sanderling has accused Snap of seeking a source code inspection protocol in bad faith. *See* Ayers Decl. Ex. O-P. Snap attaches the communications to illustrate its good faith.

and sensitive assets, and takes the protection of its code extremely seriously. Zalewski Decl., ¶¶ 4-5. The Snapchat application offers Snap's users a variety of unique features that are not available on other social media applications. *Id.* If Snap's source code was released to the public, Snap would lose its competitive advantage in an increasingly crowded social media market. *Id.*

Additionally, any disclosure of Snap's source code poses a significant technological security risk to Snap's users. *Id.*, ¶ 6. Snap strives to ensure that it develops vulnerability-free source code; that said, mistakes do happen, especially given the scale of Snap's operations. *Id.* In light of this, any accidental or intentional disclosure of Snap's source code can greatly aid malicious actors in their efforts to circumvent the security measures that Snap uses to protect user data, including ████████████████ Snap uses to protect Snapchat application users' private communications against eavesdropping. *Id.* Snap considers its ability to provide a safe environment for its users as a defining property of its platform and a critical competitive advantage. *Id.*, ¶ 7. Snap's code implements a variety of proprietary and innovative mechanisms to detect malicious actors and stop them from sending out spam, spreading misinformation, or carrying out phishing and other attacks against Snap's user base. *Id.*, ¶¶ 8-19. Any disclosure of ████████ ████ implemented in Snap's code – either accidental or deliberate – would greatly aid malicious actors, significantly weaken those protections, and harm Snap. *Id.*, ¶ 7; *see also* Ayers Decl. Ex. Q, Snap Inc. Form 10-K for the fiscal year ended December 31, 2019, at SNAP_00004993-95, 5018 (noting (1) Snapchat is Snap's "flagship product[;]" (2) Snap invests heavily invests in its products; (3) user data privacy is important to Snap; (4) Snap works hard to secure user data; (5) Snap's success depends in part on its ability to protect its intellectual property; (6) Snap uses internal controls to restrict access to proprietary technology; and (7) as of December 31, 2019, Snap had recorded a total of $853.3 million of goodwill and intangible assets).

**B.**     ***Snap Goes To Extraordinary Lengths to Protect Its Source Code.***

Snap protects its source code through a multi-factored and multi-tiered approach of policies and technological security programs and features. Zalewski Decl., ¶ 8. Snap's Information Security Policy identifies four categories of data classification for purposes of confidentiality. *Id.*, ¶ 4. Source code is categorized as very sensitive (the highest level). *Id.* Compliance with Snap's Information Security Policy is mandatory – every Snap employee and contractor must read and execute it, and it applies to Snap Inc. globally, including all subsidiaries and acquisitions. *Id.*, ¶ 9. Snap's Information Security Policy follows the principle of "least privilege." *Id.*, ¶ 10. This means that the function of the work to be performed controls access to Snap source code. *Id.* Snap grants read-access to source code only to people that require it to do their job. *Id.* Additionally, Snap strictly restricts write-access to ██████████████████████████████. *Id.*

Snap also strictly restricts access to its code technologically. *Id.*, ¶ 12. ████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

        ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

SMRH:4842-2612-2709



Snap also uses a variety of traditional security programs to further ensure the protection of its intellectual property, including source code. *Id.*, ¶ 16.

Snap also acquired and makes exclusive use of a proprietary technology that obscures any code the public might be able to access through the Snapchat application. *Id.*, ¶ 18. Essentially, this technology applies sophisticated compiler-level transformation to the code. *Id.*. Span uses this proprietary technology to make it more difficult to reverse-engineer Snap's code. *Id.*.

## IV.   GOOD CAUSE EXISTS FOR A SOURCE CODE INSPECTION PROTOCOL.

For good cause, the Court may issue an order that specifies the terms, proscribes the method, and limits the scope of discovery. Fed. R. Civ. P. 26(c). Additionally, Rule 26(c) permits the Court to require a trade secret or other confidential research, development, or commercial information to be revealed only in a specified way. *Id.* Finally, Local Patent Rule 1.4 also permits a party to move to modify the Model Order for good cause. As set forth below, good cause exists for requiring a source code inspection protocol in this case.

### A.   *The Federal Circuit, this Court, And Many Others Have Recognized The Necessity Of Source Code Inspection Protocols.*

The Federal Circuit and numerous district courts across the country (including this one)

have long recognized the necessity of source code inspection protocols. "[T]he significant consequences that might result from unauthorized or inadvertent disclosure"[5] of source code is so widely recognized that multiple courts across the country automatically include source code inspection protocols in their Model Orders.[6] "[S]ource code requires additional protections to prevent improper disclosure because it is often a company's most sensitive and most valuable property." *Drone Technologies, Inc. v. Parrot S.A.*, 838 F.3d 1283, n. 13 (Fed. Cir. 2016) (vacating and remanding default judgment against defendant for failure to produce all source code).

"Despite the well-intentioned provisions of protective orders designed to guard confidential information, 'there may be circumstances in which even the most rigorous efforts of the recipient of such [sensitive] information to preserve confidentiality in compliance with . . . a protective order may not prevent inadvertent compromise.'" *Id.* (internal citations omitted). "As a result, district courts regularly provide for additional restrictions on discovery to account for the unique characteristics of source code." *Id.*

This Court has repeatedly recognized the need to modify the Model Order in technology cases to include source code inspection protocols. For example, in *Berkheimer v. Hewlett Packard*

---

[5] *See Drone Technologies, Inc. v. Parrot S.A.*, 838 F.3d 1283, n. 13 (Fed. Cir. 2016).

[6] *See e.g.,* Model Protective Order for Litigation Involving [Patents] Patents, Highly Sensitive Confidential Information and/or Trade Secrets, ¶ 9 (N.D. Cal.), *available at* https://www.cand.uscourts.gov/wp-content/uploads/forms/model-protective-orders/ND_Cal_Patent_Highly_Sensitive_Model_Prot_Ord_Revised.docx; Appendix LPR 2.2, ¶¶ 12-19 (W.D. Penn.), *available at* https://www.pawd.uscourts.gov/sites/pawd/files/Local%20Patent%20R%20-%202012-5-2015.pdf; Source Code Provision To Be Inserted In Model Commission APO (Int'l Trade Comm.), *available at* https://www.usitc.gov/press_room/documents/featured_news/Ediscovery_attachment1.pdf#:~:text=Source%20Code%20Provision%20to%20be%20inserted%20in%20Model,object%20code%20%28i.e.%2C%20computer%20instructions%20and%20data%20; Judge Andrew Guilford (ret. 2019) Standing Protective Order, ¶5 (C.D. Cal.), *available at* https://www.cacd.uscourts.gov/sites/default/files/documents/AG/AJG/AJG%20Standing%20Protective%20Order.pdf ; Chief Judge Leonard Stark Default Standard for Access to Source Code (D. Del.), *available at* https://www.ded.uscourts.gov/sites/ded/files/DefStdAccess.pdf; Chief Judge Rodney Gilstrap Sample Protective Order For Patent Cases, ¶ 10 (E.D. Tex.), *available at* https://www.txed.uscourts.gov/sites/default/files/judgeFiles/Sample_Protective_Order_Patent_Cases_%28April%202019%29.docx.

*Co.,* Case No. 1:12-cv-09023, Doc. 56, (N.D. Ill. April 7, 2014), this Court granted HP's motion to modify the Model Order to require a source code inspection protocol. The plaintiff demanded that HP produce its source code on "compact discs." *Berkheimer*, Case No. 1:12-cv-09023, Doc. 56, (N.D. Ill. April 7, 2014), p. 3. Noting that "any party can move to modify the [Model Order] for good cause," the Court found that "[t]he production and review of source code involves certain security risks because of its highly confidential and proprietary nature[.]" *Id.* (citing *Metavante Corp. v. Emigrant Sav. Bank*, 2008 WL 19695961 at *3 (E.D. Wis. May 5, 2008)).

Like the Federal Circuit, the Court recognized that "[s]everal courts have addressed the issue of how source code should be produced and have ordered that it be produced in the same or similar manner as proposed by [d]efendant in this case." *Id.* (citing *CIVIX-DDI v. Hotels.com et al.,* No. 05 C 6869 [Dkt.#602] (N.D. Ill. April 1, 2010) (denying plaintiff's motion to compel source code production at defendant's counsel's office in Chicago and ordering plaintiff to review source code on a secure computer at defendant's offices in California) (citing *Minnesota v. CMI of Ky., Inc.*, 2009 WL 2163616, at *7 (D. Minn. July 16, 2009) and *Polycom Inc. v. Codian, Ltd.*, 2007 WL 194588, at *3 -4 (E.D. Tex. Jan. 22, 2007) (holding that plaintiff's inconvenience and travel expense do not establish good cause for reviewing source code at plaintiff's preferred location)).

In particular, the Court found that HP's "source code [was] the lifeblood of the [accused] software product" and a "repository of the collective knowledge of all the computer programmers who have worked on the … software."[7] *Berkheimer*, Doc. 56, p. 2. Importantly, the Court found that HP "stored [source code] in a secured development environment that can only be accessed by

---

[7] *See also Via Vadis Controlling GmbH v. Skype, Inc.*, No. Civ.A. 12–MC–193-RGA, 2013 WL 646236, at *3 (D. Del. Feb. 21, 2013) (source code might represent a company's "most sensitive and confidential property" and that, in "U.S. litigation, extreme measures are ordered to protect [its] confidentiality").

a limited number of appropriately credentialed . . . personnel . . . who have a business need to access the source code." *Id.* Ultimately, the Court agreed that HP's code was entitled to additional protections "not provided in the Local Patent Rule 1.4 Protective Order[.]" *Id.*

Similarly, in *Philips Medical Systems, Inc.*, this Court entered a Protective Order[8] that required the receiving party to (1) inspect the code on a non-networked computer; (2) request print-outs of code; and (3) maintain printed copies of code in a locked and secured location. *Philips Medical Systems, Inc.*, v. *Zetta Medical Technologies, LLC,* Case No. 1:17-cv-03425, Doc. 43, (N.D. Ill. Nov. 14, 2017), pp. 8-13. That Protective Order also prohibited the receiving party from making digital copies of any source code print outs "except as may be necessary for use in court filings proceedings, and expert reports." *Id.*, p. 10. Other courts have similarly recognized the propriety of an inspection protocol similar to the one Snap proposes. *See e.g.*, *EPL Holdings, LLC v. Apple Inc.*, Case No. C-12-04306 JST, 2013 WL 2181584 at *6 (N.D. Cal. May 20, 2013) (parties must meet and confer regarding treatment of electronic copies of code "[g]iven the high risk associated with producing electronic copies of source code and then transferring those copies online.") *GeoTag v. Classified Ventures, LLC*, Case No. 1:13-cv-00295, Doc. 102, (E.D. Tex. January 8, 2013) (inspection must occur at producing party's office); *Juniper Networks, Inc. v. Bahattab*, Case No. 07-1771, 2008 WL 11403235 (PLF)(AK), at *3 (D.D.C., Nov. 12, 2008) (party "show[ed] good cause . . . to restrict the transmission of source code from the [U.S.]").

Like the producing parties in all of these cases, Snap's source code is the "lifeblood" of the company and can be considered "a repository of the collective knowledge of all the computer programmers who have worked on the [Snapchat application.]" Monastyrshyn Decl., ¶ 5 ("the only true repository of information that accurately describes the operation and construction of all

---

[8] The Court entered an order following motion practice. *See Philips Medical Systems, Inc.*, Case No. 1:17-cv-03425, Doc. 37 (N.D. Ill. September 28, 2017).

aspects or elements of Snapchat's filters and lens features is the source code that enables the application to operate on a user's mobile device"); Zalewski Decl., ¶¶ 4-7. Snap also takes extraordinary measures to ensure the security of its source code, and would experience significant hardship if all or portions of its source code were inadvertently disclosed to bad actors. Zalewski Decl, ¶¶ 4-10; *see also* Ayers Decl. Ex. Q, Snap Inc. Form 10-K for the fiscal year ended December 31, 2019, at SNAP_00004993-95, 5018. The above cases, including cases from this Court, show that source code is a special category that should be afforded special protections.

**B.** **The Model Order Does Not Obligate Recipients Of Snap's Code To Protect It From Inadvertent Disclosure.**

Snap does not automatically assume that participants in litigation will fail to comply with the restrictions contained in the Model Protective Order. While a source code inspection protocol does guard against nefarious and intentional violations of the Court's Model Protective Order, more importantly it minimizes the risk of unintentional disclosures. Nothing in the Model Order prevents an attorney from e-mailing hundreds of pages of source code without first encrypting it, or prevents any recipient entitled to receive Highly Confidential information from storing Snap's source code digitally on their home computer (with limited security protections). Nothing in the Model Order limits the amount of source code that must be produced to only those lines the parties consider relevant to their infringement and non-infringement positions, or prevents a party from storing millions of lines of source code in a document production data repository.[9]

Hackers understand the value of e-discovery. "Basically, law firms are the next frontier for hackers. Experts agree that many hackers view law firms as 'one-stop shopping' for electronically stored information-accessing both the law firms' information as well as the clients'. And law firms

---

[9] Even if Snap removes source code that is entirely unrelated to Snapchat's lenses and filters, Snap estimates at least 3 million lines of code will remain in any data that Sanderling inspects. Monastyrshyn Decl., ¶ 7.

generally have lower security than most …corporat[ions]."[10] The American Bar Association's 2018 Legal Technology Survey Report indicates that 23% of respondents reported that "their firms had experienced a security breach at some point."[11] In 2020, celebrity law firm Grubman Shire and e-discovery vendor Epiq Global were hacked.[12] Production of Snap's source code without an inspection protocol unnecessarily risks inadvertent disclosure of this valuable asset. *Telebuyer, LLC v. Amazon.com, Inc.*, Case No. 13-cv-1677, 2014 WL 5804334 at *2 (W.D. Wash. Jul. 7, 2014) (source code provisions "designed not only to hold designated parties to their word, but also to prevent any others from gaining unauthorized access to the information).

### C.   *Sanderling's Counsel Sought Identical Protections For Their Other Clients.*

As set forth in Snap's Response to Sanderling's Motion to Compel (Doc. 44), Sanderling's counsel is intimately familiar with source code inspection protocols. In the last five years, counsel for Sanderling have individually and collectively represented ten plaintiffs and defendants in patent cases where the Court entered an order requiring a source code inspection protocol.[13] Many

---

[10] For hackers, law firms are "one-stop shopping," *available at* https://www.dentons.com/en/insights/articles/2016/september/6/for-hackers-law-firms-are-one-stop-shopping.

[11] 2*018 Cyber Security, available at* *https://www.americanbar.org/groups/law_practice/publications/techreport/ABATECHREPORT2018/2018Cybersecurity/*.

[12] Law Firm Representing Lady Gaga, Madonna, Bruce Springsteen, Others Suffers Major Data Breach, *available at* https://variety.com/2020/digital/news/entertainment-law-firm-hacked-data-breach-lady-gaga-madonna-bruce-springsteen-1234602737/; Epiq's Ransomeware Response Is By The Books But Dangers Still Lurk, *available at* https://www.abajournal.com/news/article/legal-services-company-shuts-down-systems-after-ransomware-attack.

[13] *AlexSam, Inc. v. Simon Property Group, LP*, Case No. 2-19-cv-00331, Doc. 37 (E.D. Tex. June 8, 2020) (representing defendant); *Jager Pro Incorporated v. W-W Manufacturing Co., Inc.*, Case No. 5-20-cv-00095, Doc. 29 (W.D. Ok. May 26, 2020) (representing defendant); *Helios Streaming, LLC v. Starz Entertainment, LLC*, Case No. 8-19-cv-02140, Doc. 45 (N.D. Cal. May 26, 2020) (representing defendants); *Lighthouse Consulting Group, LLC v. Bank of America*, NA, Case No. 2-19-cv-00250, Doc. 53 (E.D. Tex. Dec. 11, 2019) (representing defendant); *UnoWeb Virtual, LLC v. Open Text, Inc.*, Case No. 2-19-cv-00008, Doc. 32 (E.D. Tex. June 10, 2019) (representing defendant); *Blackbird Tech LLC d/b/a Blackbird Technologies v. Advanced Discovery Inc.*, Case No. 1-16-cv-00413, Doc. 28 (D. Del. Jan. 19, 2017) (representing defendant); *Realtime Data LLC d/b/a IXO v. Acronis, Inc.*, Case No. 1-17-cv-11279, Doc. 30 (D. Mass. Sept. 13, 2017) (representing defendant); *FatPipe, Inc. v. Viptela, Inc.*, Case No. 1-16-cv-00182,

of those orders include protections similar to what Snap now proposes. For example, Mr. Carroll and Mr. Caixeiro currently represent movie channel defendant Starz Entertainment LLC in a patent infringement lawsuit. The Central District of California entered an order on May 26, 2020 that required a source code inspection on a non-networked computer. *Helios Streaming, LLC v. Starz Entertainment, LLC*, Case No. 8-19-cv-02140, Doc. 45, pp. 18-19 (N.D. Cal. May 26, 2020). Additionally, under the protocol, the plaintiff could only request print outs of source code that it "believes in good faith are necessary to understand a relevant feature of an accused instrumentality." *Id.*, pp. 20-21. In no event was the plaintiff permitted to request entire source code files as an alternative to inspecting the source code in-person. *Id.*, p. 21.

The order also restricted electronic copies of source code, and permits the plaintiff only to "make and use ***snippets*** and ***images*** of source code if necessary for court filings, expert reports, discovery responses, and other similar documents." *Id.*, p. 22. In other words, the order prohibited wholesale copying of source code into digital media. *Id.* The order also prohibited the parties from including copies in correspondence. *Id.* Snap's source code is entitled to no less protection than the source code of any other technology defendant Mr. Carroll and Mr. Caixeiro have represented.

### D.      *Sanderling Previously Agreed to Most of The Protections Snap Seeks.*

Sanderling cannot legitimately argue that a source code inspection protocol unduly prejudices its ability to prosecute its case. Snap's proposed protocol is consistent with other protocols entered in numerous patent cases across the country. Furthermore, Sanderling largely agreed to the protocol before the Court entered its December 8 Order. Ayers Decl., ¶ 10, Ex. H. Sanderling's current refusal to agree to Snap's inspection protocol is inappropriate gamesmanship.

Prior to the Court's December 8 Order, the only issues in dispute relating to the entire

---

Doc. 46 (D. Del. Sept. 7, 2016) (representing plaintiff); *FatPipe, Inc. v. Talari Networks, Inc.*, Case No. 1-16-cv-00054, Doc. 43 (E.D.N.C. Nov. 4, 2015) (representing plaintiff).

protective order were (1) the amount of code Sanderling could copy into digital media, and (2) whether the protocol should require export control compliance and a restriction on transmission of produced material outside the United States. *Id*. Snap has eliminated the export control compliance provision. Snap's proposed protocol, however, still requires Sanderling not transmit the code outside of the United States. Such a restriction is not uncommon.[14] Sanderling has not explained why it needs to transmit Snap's code outside the United States.

Additionally, to avoid any potential dispute regarding electronic copies, Snap modified the inspection protocol to permit creation of "electronic copies of sections of code for the preparation of court filings, pleadings, expert reports, or other papers[.]" Ex. A, p. 5. Snap's protocol also permits Sanderling to "transmit short sections of code excerpted in other material . . . if such transmission[s] are protected using encryption." *Id.*, p. 5. After the Court entered its December 8 Order, Sanderling also raised new complaints about provisions it previously agreed to. Specifically, Sanderling complained that (1) it could not keyword search Snap's code[15] and (2) Sanderling should not have to "print to PDF" the source code it wants Snap to produce. To address these concerns, Snap modified the inspection protocol to include requirements that Snap: (a) include software on the source code review machine that will permit Sanderling to perform reasonable keyword searches;[16] and (b) provide a printer for on-site printing during inspection of the source code.[17] Despite Snap's reasonable attempts to accommodate Sanderling's complaints,

---

[14] *See Sound View Innovations, LLC v. Facebook, Inc.*, Case No. 1:16-cv-00116-RGA, Doc. 35 at pp. 14-15, 19 (D. Del., July 8, 2016); *Rockstar Consortium US LP v. Google Inc.*, Case No. 2:13-cv-893, 2014 WL 5831041 at *4-5 (E.D. Tex., June 19, 2014).

[15] The source code inspection machine included functionality allowing Dr. Stevenson to search Snap's code. Doc. 48-1, Mackin Decl., ¶¶ 3-11. Sanderling's accusation that Snap obstructed Dr. Stevenson's review of Snap's code because he could not search it was false. *Id.*

[16] Previously, Sanderling agreed that it would provide all source code review tools that it required. *Compare* Ayers Decl., Ex. C, p. 9 with *id.*, Ex. E, pp. 8-9 (receiving party to provide tool).

[17] Previously, Sanderling agreed that its expert would print to .pdf those lines of code that it wanted produced. *See* Ayers Decl., Ex. C, p. 12.

it now refuses to agree to any source code inspection protocol and has accused Snap of acting in bad faith.[18] Sanderling has identified absolutely *no reason* why complying with Snap's proposed protocol is an undue hardship. Given the significant harm that could befall Snap if source code for the Snapchat application were improperly disclosed, the restrictions Snap proposes are reasonable.

## V.      GOOD CAUSE EXISTS FOR AN ORDER REQUIRING A PROSECUTION BAR.

Prior to the Court's December 8, 2020 Order, Sanderling agreed to all of the provisions of the patent prosecution bar. Ayers Decl., Ex. E, pp. 13.[19] Inexplicably, it now contends that a patent prosecution bar is unnecessary and it will not agree to one. Without a patent prosecution bar, Sanderling's outside counsel could use Snap's source code to prepare patents designed to read on Snap's code for Sanderling or its other clients. The Federal Circuit has held that prosecution bars are appropriate where "the information designated to trigger the bar, the scope of activities prohibited by the bar, and the subject matter covered by the bar reasonably reflect the risk presented by disclosure of proprietary competitive information." *In re Deutsche Bank Trust Co. Americas*, 605 F.3d 1373, 1381 (Fed. Cir. 2010).[20] Snap's proposed prosecution bar is sufficiently narrow to prevent attorneys (and experts) who have received Snap's highly confidential technical information from knowingly or unknowingly using such technical information to prosecute patents for either Sanderling or Snap's competitors (like Facebook) and causing Snap competitive harm.

Specifically, Snap's proposed bar is limited only to individuals that review or learn of Snap's Highly Confidential or Highly Confidential Source Code technical information. Ex. A., p. 6. It is expressly limited only to "patent applications pertaining to the technology produced or at issue in this case." *Id.* It expires 2 years after the conclusion of this lawsuit. *Id.* It does not prevent

---

[18] Ayers Decl., Ex. O-P.
[19] Snap added the last sentence of the proposed bar in Exhibit A to narrow its application to technical information only. *Compare* Ayers Decl., Ex. E, pp. 13-14 to Ex. A, pp. 6.
[20] Prosecution bars are governed by Federal Circuit law. *In Re Deutsche Bank*, 605 F.3d at 1378.

any individual from representing a party whose patent is challenged in a reexamination or other patent office proceeding so long as that individual does not participate in drafting or amending any claims. *Id.* Courts routinely enter similar patent prosecution bars. *See e.g.*, *Telebuyer, LLC*, 2014 WL 5804334 at *4 (proposed two-year prosecution bar "necessary as well as reasonable in scope and duration"); *EPL Holdings, LLC*, 2013 WL 2181584 at *2-4 (prosecution bar that permits participation in reexamination but prohibits assisting in claim amendment reasonable).[21]

A patent prosecution bar is necessary here because the Founder and Director of Sanderling is the inventor of the Asserted Patents.[22] *Voice Domain Technologies, LLC v. Apple, Inc.*, Case No. 13-40138-TSH, 2014 WL 5106413 (D. Mass. Oct. 8, 2014) (prosecution bar reasonable where plaintiff employed inventor). Additionally, the Dentons law firm includes attorneys that advise Snap competitors (like Facebook) on "patent protection and monetization strategies" and "product and feature development."[23] Snap is not attempting to deprive Sanderling of its counsel of choice[24] – any patent attorney at Dentons, or any other firm, who has not received information specified in the bar could prosecute patents for Sanderling. Instead, the bar is merely preventing Sanderling's counsel from knowingly or unknowingly causing Snap competitive damage by using its highly confidential technical information in patent prosecution for others.

## VI.   **CONCLUSION**

For all of the above reasons, Snap respectfully requests the Court enter the Order attached as Exhibit A to this Motion, and that the Court hold (virtual) oral argument on this motion.

---

[21] Most of the agreed protective orders Mr. Carroll and Mr. Caixeiro have entered include similar prosecution bars, including *Starz Entertainment, LLC*, Case No. 8-19-cv-02140, Doc. 45, pp. 16-17.
[22] Mr. Jacobs is presently prosecuting at least one patent application. Upon information and belief, Dentons is not assisting in the prosecution of that patent application.
[23] *See e.g.*, https://www.dentonslee.com/en/nicholas-park; https://www.dentons.com/en/jeff-modisett
[24] Upon information and belief, neither Mr. Carroll nor Mr. Caixeiro are part of the USPTO's bar.

Dated: January 4, 2021                    Respectfully submitted,

                                          SHEPPARD, MULLIN, RICHTER & HAMPTON LLP


                                          By: */s/ Bradley C. Graveline*
                                                Bradley C. Graveline (6203817)
                                                SHEPPARD MULLIN RICHTER & HAMPTON LLP
                                                70 West Madison Street, 48th floor
                                                Chicago, Illinois 60602
                                                Office: (312) 499-6316
                                                Cell: (312) 339-4804
                                                Fax: (312) 499-6301
                                                bgraveline@sheppardmullin.com

                                                Steven G. Schortgen *(Pro Hac Vice)*
                                                Jennifer Klein Ayers *(Pro Hac Vice)*
                                                SHEPPARD MULLIN RICHTER & HAMPTON LLP
                                                2200 Ross Ave, 24th Floor
                                                Dallas, Texas 75201
                                                Office: (469) 391-7400
                                                Fax: (469) 391-7401
                                                sschortgen@sheppardmullin.com
                                                jayers@sheppardmullin.com

                                                Jesse Salen *(Pro Hac Vice)*
                                                SHEPPARD MULLIN RICHTER & HAMPTON LLP
                                                12275 El Camino Real, Ste. 200
                                                San Diego, CA 92130-4092
                                                Office: (858) 720-8964
                                                Fax: (858) 523-6722

                                          **ATTORNEYS FOR DEFENDANT SNAP INC.**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that all counsel of record who are deemed to have

consented to electronic service are being served with a copy of this document via electronic mail.


/s/ *Bradley C. Graveline*